## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | **CASE NO. 07 B 14987** |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| ———————————————————— | ) | |
| | ) | |
| **FREDERICK J. GREDE**, not individually but as | ) | |
| Liquidation Trustee and Representative of the | ) | |
| Estate of Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ADV. NO. 09 A 00521** |
| **UBS SECURITIES, LLC,** | ) | |
| | ) | |
| Defendant. | ) | |

### ANSWER, AFFIRMATIVE DEFENSES AND JURY DEMAND
### OF DEFENDANT UBS SECURITIES, LLC

Defendant UBS Securities, LLC ("UBS"), through its attorneys, files this Answer and

Affirmative Defenses to the Complaint filed by the Trustee Frederick J. Grede (the "Trustee"),

and  alleges as follows:

### NATURE OF THE ACTION

1.      This is an adversary proceeding by the Trustee against UBS Securities,
LLC ("Defendant") to avoid $14,401,342.15 of the $108,387,950.97 in transfers made by
Sentinel Management Group, Inc. ("Sentinel" or "Debtor") to Defendant within the two years
preceding the commencement of Sentinel's bankruptcy case.

**ANSWER:**  UBS admits that the Trustee commenced an adversary proceeding against UBS and

purports to seek to recover $14,401,342.15 from UBS and UBS denies that it is liable to the

Debtor with respect to those transfers.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding is related to and arises under the Chapter 11 case, *In re Sentinel Management Group, Inc.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, as Case No. 07 B 14987.

**ANSWER:**  UBS admits the allegations set forth in paragraph 2.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

**ANSWER:**  UBS admits the allegations set forth in paragraph 3.

4.      This Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (F) and (O).

**ANSWER:**  UBS admits the allegations set forth in paragraph 4.  UBS does not consent to a jury trial in the Bankruptcy Court.

## THE PARTIES AND RELATED ENTITIES

5.      Plaintiff Frederick J. Grede was formerly the chapter 11 trustee for the Debtor, duly appointed under section 1104 of the Bankruptcy Code by Orders of the Bankruptcy Court dated August 23 and 29, 2007.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph 5 and, therefore, denies the same.

6.      On December 15, 2008, the Bankruptcy Court entered an Order confirming the Fourth Amended Chapter 11 Plan of Liquidation for Sentinel Management Group, Inc. (the "Plan"). The Effective Date of the Plan was December 17, 2008. On the Effective Date, in accordance with § 6.3 of the Plan and the Bankruptcy Court's Order confirming the Plan, the chapter 11 trustee resigned and became the Liquidation Trustee for the Sentinel Liquidation Trust.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph 6 and, therefore, denies the same.

7.      On the Effective Date, and in accordance with Article VI of the Plan and the Bankruptcy Court's Order confirming the Plan, the Liquidation Trustee for the Sentinel Liquidation Trust became the representative for Sentinel Management Group, Inc.'s estate. Under the Plan, as estate representative, the Liquidation Trustee is responsible for and has standing to prosecute the claims and causes of action set forth in this Complaint.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 7 and, therefore, denies the same.

        8.     Sentinel is an Illinois corporation which was at relevant times headquartered in Northbrook, Illinois. Sentinel was registered with the Securities and Exchange Commission ("SEC") as an investment adviser and with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM").

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 8 and, therefore, denies the same.

        9.     Defendant UBS Securities, LLC is a Delaware corporation with its principal place of business in New York, New York. At all times relevant to this Complaint, Defendant was registered with the CFTC as an FCM and was a member of Sentinel's "SEG 1" customer pool.

**ANSWER:** UBS denies the allegations set forth in paragraph 9, except admits that UBS is a

Delaware limited liability company; UBS was registered with the CFTC as an FCM and, from

approximately September 30, 2006 through March 31, 2007, UBS had a SEG 1 account with

Sentinel.

        10.    On or about September 30, 2006, Defendant purchased the commodities and futures trading business of ABN AMRO, Incorporated ("ABN AMRO") including ABN AMRO's accounts at Sentinel and assumed all of the liabilities and obligations of that business.

**ANSWER:** UBS denies the allegations set forth in paragraph 10, except admits that, on or about

September 30, 2006, UBS purchased the commodities and the futures business of ABN pursuant

to a Stock and Asset Purchase Agreement dated May 25, 2006 and refers to that agreement for

the terms thereof.

## SENTINEL'S PURPORTED CUSTOMER POOLS

11.    Sentinel primarily managed investments of short-term cash for various clients, including other FCMs, hedge funds, financial institutions, pension funds, and individuals.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 11 and, therefore, denies the same.

12.    Sentinel solicited clients by offering them the opportunity to participate in a variety of supposedly safe investment programs, each of which purportedly had its own investment policy designed to meet the requirements and risk profiles of different types of clients. Regardless of which investment program a particular client chose, Sentinel purportedly pooled the client's assets with those of similar types of clients in segregated client custodial accounts maintained at the Bank of New York ("BONY"). The accounts were referred to within Sentinel as SEG 1, SEG 2 and SEG 3.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 12 and, therefore, denies the same.

13.    SEG 1 was supposed to contain customer funds and property of registered FCMs.  The investment of FCM customers' funds is subject to the provisions of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et seq., and the rules and regulations promulgated thereunder by the CFTC, 17 C.F.R. § 1.1 - 190.10, including the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25, and generally is supposed to consist of only the highest grade securities and similar highly liquid investments.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 13, except admits the investment of FCM

customers' funds is subject to the provisions of the Commodity Exchange Act ("CEA"), 7 U.S.C.

§ 1 et seq., and the rules and regulations promulgated thereunder by the CFTC, 17 C.F.R. § 1.1 -

190.10, including the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25.

14.    SEG 2 was supposed to contain the funds and property of FCM customers that are engaged in trading at foreign exchanges, invested in accordance with CFTC Rule 30.7, 17 C.F.R. § 30.7. Rule 30.7 imposes restrictions on the investment of customer funds similar to those in Rule 1.25.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 14 and, therefore, denies the same.

15.     SEG 3 was supposed to contain assets of all other types of clients, including FCMs' own (*i.e.*, non-customer) funds, hedge funds, trust accounts, endowments and individuals. About 75% in amount of the SEG 3 investments were supposed to be invested in Rule 1.25 compliant securities.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 15 and, therefore, denies the same.

16.     In addition to the supposed SEG 1, SEG 2, and SEG 3 customer pools, Sentinel managed a "House" or "Street" portfolio, which was a portfolio of securities held by Sentinel for the ultimate benefit of certain insiders, including Sentinel's chairman, Philip Bloom, its CEO, Eric Bloom, and its vice-president of trading, Charles Mosley.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 16 and, therefore, denies the same.

17.     The creation of these customer SEG pools was the product of two federal regulatory schemes that governed Sentinel's business. Both required that customer assets in SEGS 1, 2 and 3 be segregated from the assets of other SEG pools and Sentinel itself.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 17, except UBS admits that certain federal

statutes and regulations require the segregation of certain customer funds.

18.     Because Sentinel was an FCM managing funds required to be segregated for the benefit of commodity customers, Sentinel was subject to the provisions of the CEA and CFTC rules and regulations promulgated thereunder.

**ANSWER:** UBS admits the allegations set forth in paragraph 18.

19.     Section 4d(a)(2) of the CEA provides that money, securities and property of customers must be separately accounted for and not commingled with the funds of the FCM. 7 U.S.C. § 6d(a)(2).

**ANSWER:** UBS denies the allegations set forth in paragraph 19 and refers to section 4(d)(a)(2)

of the CEA for the terms thereof.

20.     Section 4d(b) of the CEA provides that "it shall be unlawful for any person. . . that has received any money, securities and property for deposit in a separate account as provided for in [section 4d(a)(2) of the CEA], to hold, dispose of, or use any such money, securities or property as belonging to the depositing futures commission merchant or any person

other than customers of such futures commission merchant." 7 U.S.C. § 6d(b).

**ANSWER:**  UBS admits that section 4d(b) of the CEA contains the quoted language and refers

to section 4d(b) for the complete terms thereof.

21.  CFTC Rule 1.20(a) provides that all customer funds shall be segregated as belonging to commodity customers, and that when deposited with any bank, shall be deposited under an account name which clearly identifies them as customer property.

**ANSWER:**  UBS denies the allegations set forth in paragraph 21 and refers to CFTC Rule

1.20(a) for the terms thereof.

22.  Sentinel was also registered as an investment adviser and was subject to the provisions of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "Investment Advisers Act"), and the rules and regulations of the SEC promulgated thereunder, 17 C.F.R.  §§ 275.0-2 – 275.222-2.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 22 and, therefore, denies the same.

23.  Section 206 of the Investment Advisers Act makes it illegal to "employ any device, scheme, or artifice to defraud any client or prospective client" and to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6.

**ANSWER:**  UBS admits that section 206 of the Investment Advisors Act contains the quoted

language and refers to section 206 for the complete terms thereof.

24.  The regulations promulgated by the SEC under section 206 provide that it is a "fraudulent, deceptive, or manipulative act, practice, or course of business" to have custody of client funds or securities except as provided in SEC Rule 206(4)-2. SEC Rule 206(4)-2, 17 C.F.R. § 275.206(4)-2, requires that client funds and securities be maintained at a "qualified custodian," which includes a depository bank, "[i]n a separate account for each client under that client's name" or "[i]n accounts that contain only [the investment adviser's] clients' funds and securities, under [the investment adviser's] name as agent or trustee for the clients."

**ANSWER:**  UBS admits that the SEC regulations referred to above contain the quoted language

but denies that Plaintiff accurately describes those regulations and refers to the regulations for

the terms thereof.

25.    It also is a violation of Section 206 of the Investment Advisers Act to use one client's assets to cover or secure securities purchases for another client when the former client does not have sufficient cash in its account to cover securities purchases on the settlement date.

**ANSWER:**  With respect to the allegations set forth in paragraph 25 of the Complaint, UBS

alleges that it sets forth a legal conclusion to which no response is required.

26.    Thus, under both regulatory regimes, Sentinel was supposed to segregate the assets of its customers in SEGs 1, 2, and 3 from the other SEG accounts and from Sentinel's House account.

**ANSWER:**  UBS admits that Sentinel was subject to certain segregation requirements and refers

to the applicable statutes and regulations for the terms thereof.

27.    In addition to the requirements of federal law, Sentinel's relationship with its customers was also supposed to be governed by an "Investment Advisory Agreement" or, with respect to certain accounts during and after 2004, an "Investment Management Agreement" (collectively "the Investment Agreements") and other representations made by Sentinel to its customers. The Investment Agreements provided discretionary authority to Sentinel to select, buy and sell securities without requesting authority from clients before executing the trades. The Investment Agreements often included an Addendum specifying the investment policy that Sentinel was supposed to use to invest the client's funds.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 27.

28.    The Investment Agreements entered into by all customers of all SEGs also provided that the customer's assets would be deposited in a custodial account for the benefit of the customer and that Sentinel would not have any interest in the funds or securities in the account.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 28.

29.    The Investment Management Agreements and Sentinel's regulatory filings with the SEC also specified that the client's assets in a particular program would be invested along with the assets of other Sentinel clients in the same program and that the client would own an indirect interest in the segregated portfolio of the relevant program. Sentinel's detailed regulatory filings with the SEC further indicate that upon redemption, customers are entitled to distributions of cash, not distributions of any of the securities in the applicable segregated portfolio.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 29 and, therefore, denies the same.


## THE BONY ACCOUNT STRUCTURE

30.    BONY, as Sentinel's custodian bank, established a series of accounts for each of the three customer SEG pools which supposedly mirrored Sentinel's customer pools.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 30 and, therefore, denies the same.

31.    As required by federal law, BONY entered into a series of letter agreements with Sentinel specifying that the funds deposited by Sentinel's customers would be segregated from customers in other SEGs and from Sentinel's own funds. Segregation letters were executed with respect to each of SEG 1, 2 and 3.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 31 and, therefore, denies the same.

32.    BONY established segregated cash accounts for U.S. denominated funds that were supposed to be held for Sentinel's customers in SEGs 1, 2 and 3, respectively.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 32 and, therefore, denies the same.

33.    BONY also established segregated securities accounts for government and government agency securities (hereinafter collectively referred to as "government securities"), such as U.S. Treasury notes, Fannie Mae and Ginnie Mae notes that were supposed to be held for Sentinel's customers in SEGs 1, 2, and 3, respectively.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 33 and, therefore, denies the same.

34.    However, BONY improperly established a single, non-segregated clearing account for all government securities transactions. Thus, all purchases and sales of government securities had to be processed through this single account, whether they were on behalf of SEGs 1, 2 or 3 or Sentinel itself.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 34 and, therefore, denies the same.

35. BONY also improperly established this government securities clearing account as the account in which BONY's extensions of credit to Sentinel, whether in the form of daytime "overdrafts" or overnight loans, were booked. (Hereafter, this account is referred to in this Complaint as the "Clearing/Collateral Account.") Thus, whenever securities were sold using this account and whenever customer funds were transferred to this account, those funds automatically went to reduce the daytime overdraft position associated with this Clearing/Collateral Account.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 35 and, therefore, denies the same.

36. BONY also established three segregated securities accounts that were supposed to hold DTC-registered corporate securities for Sentinel's customers in SEG 1, SEG 2 and SEG 3, respectively.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 36 and, therefore, denies the same.

37. BONY also established a DTC clearing account, also known as the "FC1 account" or the "Street Securities Account" ("the DTC Clearing Account" hereafter) to clear both customer and House transactions in DTC-registered securities. Just like the Collateral/Clearing Account, however, the DTC Clearing Account was not a segregated account.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 37 and, therefore, denies the same.

38. The DTC Clearing Account was not used for cash transactions. Cash deposits, withdrawals and settlement payments relating to DTC corporate transactions were processed in the Clearing/Collateral Account.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 38 and, therefore, denies the same.

39. A similar account structure also was established by BONY for securities registered with Euroclear.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 39 and, therefore, denies the same.

40.     Sentinel also had cash accounts for SEGs 1, 2 and 3 at JP Morgan. Those accounts were supposed to hold cash associated with customer accounts.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 40 and, therefore, denies the same.

41.     As explained below, the BONY account structure did not in fact result in any segregation of customer funds, but rather promoted and led to commingling and misappropriation of such funds by Sentinel and BONY.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 41 and, therefore, denies the same.

### SENTINEL AND BONY'S MASSIVE COMMINGLING AND TREATMENT
### OF ALL ASSETS AS PART OF A SINGLE UNDIFFERENTIATED POOL

42.     Despite their regulatory obligations and the promises to Sentinel's customers, Sentinel and BONY did not in fact segregate customer assets for customers of SEGs 1, 2 or 3 at any relevant time. Instead, Sentinel, aided and abetted by BONY, engaged in a massive scheme to commingle and misuse customer assets of all customer SEGs as if they were part of a single undifferentiated pool of assets, which also included Sentinel's own funds. While Sentinel attempted to create the false appearance of segregation, in fact, all assets managed by Sentinel were treated as a single pool belonging to Sentinel itself.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 42 and, therefore, denies the same.

43.     This commingling and pooling of customer assets began in earnest when Sentinel fundamentally changed its operations in about 2003. Prior to that Sentinel had purchased only high-grade securities and did not have a significant House portfolio. The BONY loan was used only to assist in providing immediate liquidity to customers. In about 2003, however, the Sentinel insiders embarked on a different program, establishing a House portfolio, buying illiquid, higher-risk and higher-return securities, and using repurchase agreements and the BONY loan as leverage to finance the purchase and control of income associated with massive amounts of securities.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 43 and, therefore, denies the same.

44.    In a typical repurchase or "repo" transaction, the repo borrower (in this case Sentinel) acquires and transfers a security to a repo lender, which in turn makes a repo "loan" to Sentinel and holds the security as collateral.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 44 and, therefore, denies the same.

45.    Repo counterparties imposed a "haircut" on the amount loaned to Sentinel in order to provide a sufficient collateral cushion above market value to satisfy Sentinel's repo obligations in the event of a default. Thus, a repo lender advanced to Sentinel, for example, only 90% of the current market value of the security subject to the repo transaction (a 10% "haircut").

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 45 and, therefore, denies the same.

46.    Absent a default, the repo borrower (here Sentinel) typically is entitled to all income generated by the security, and thus Sentinel could control all income associated with the security while only paying the haircut (essentially acquiring the security on "margin").

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 46 and, therefore, denies the same.

47.    Because Sentinel had virtually no capital, the Sentinel Insiders financed the net acquisition cost for securities that were the subject of repo transactions (*i.e.* the haircut) using Sentinel's overnight loan facility with BONY. As the number of securities positions controlled by Sentinel grew, the loan ballooned. Customers were not advised, however, of even the existence of the loan, let alone that the loan was being secured with securities that were supposed to be segregated.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 47 and, therefore, denies the same.

48.    Sentinel's loan, in turn, was secured with certain securities which it falsely told the customers belonged to specific customers and were held in segregation. In actuality, to secure the BONY loan Sentinel arbitrarily transferred into or left in the BONY Clearing/Collateral Account whatever securities were at hand and were necessary to make sure BONY was fully collateralized, without regard to segregation and without regard to whom those assets supposedly belonged.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 48 and, therefore, denies the same.

49.     This leveraging scheme and the BONY account structure led to the commingling of customer funds from the day they were deposited.

**ANSWER**:  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 49 and, therefore, denies the same.

50.     Specifically, when a customer in SEGs 1, 2 or 3 deposited funds, those funds initially were deposited by the customer into the corresponding segregated cash account at BONY. However, at the end of each day, any funds remaining in those accounts, after they were used to pay redeeming customer withdrawals (if any), were transferred to the BONY Clearing/Collateral Account.

**ANSWER**:  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 50 and, therefore, denies the same.

51.     There was always a significant negative cash balance in the Clearing/Collateral Account as a result of BONY's huge overnight loans to Sentinel, which were converted into daytime overdrafts each day. For instance, throughout 2007, the daytime overdraft in the Clearing/Collateral Account was always well in excess of $200 million, was often over $300 million, and sometimes exceeded $500 million. Thus, when customer funds that had been deposited during the day were, at day's end, transferred to the Clearing/Collateral Account, they automatically went to pay down the overdraft in the account. In short, those funds, which were supposed to be segregated for the benefit of the customers, disappeared.

**ANSWER**:  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 51 and, therefore, denies the same.

52.     Similarly, because all securities sales had to settle through the Clearing/Collateral Account or another of the BONY non-segregated clearing accounts, every time a security that was supposed to be held in segregation was sold, the cash proceeds of that sale were automatically credited to Clearing/Collateral account and served to reduce the overdraft loan balance in that account, instead of being immediately credited to the appropriate SEG.

**ANSWER**:  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 52 and, therefore, denies the same.

53.     Sentinel did control more than three billion dollars in face value of securities, some of which it represented to customers as being held for the benefit of particular SEGs. However, those securities were in fact purchased using the proceeds of the BONY loan and repo agreements. BONY's loan was not made to specific customer SEGs; indeed, the

customers did not even know that the loan existed. Instead, the loan was made to Sentinel itself. Thus, if anyone owned these securities, it was Sentinel itself, not the customers.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 53, except denies that Sentinel owned

securities purchased with customer funds.

54.    And, as explained below, in the summer of 2007, to secure the BONY loan Sentinel and BONY freely moved huge blocks of supposedly segregated securities into and out of the BONY Clearing/Collateral Account, as well as the DTC Clearing Account, without regard to who supposedly owned the securities or who benefited from the loan.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 54 and, therefore, denies the same.

55.    Moreover, the Sentinel insiders' representation to customers about the assignment or allocation of specific securities to their SEG was a complete fabrication. In fact, Sentinel treated all of the more than $3 billion in securities it controlled as part of a single pool. At the end of each business day, Sentinel would refer to the securities in that undifferentiated pool and assign or "allocate" certain securities to customer SEGs, but solely for purpose of reporting to customers.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 55 and, therefore, denies the same.

56.    The securities so "allocated" were not necessarily segregated for the customers of that SEG. Often the securities that were "allocated" to customers were not segregated at all -- they were instead held in BONY's unsegregated Clearing/Collateral Account or the unsegregated DTC Clearing Account and thus already pledged to secure BONY's loan.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 56 and, therefore, denies the same.

57.    In addition, securities that were reported on customer statements as being segregated for the benefit of one SEG were sometimes actually being held at BONY in the account of a different SEG.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 57 and, therefore, denies the same.

58.    Moreover, many securities were reported on both SEG 1 and SEG 3 customer statements, in various shifting percentages, as belonging to each SEG, but those securities were not actually segregated in proportion to those assignments.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 58 and, therefore, denies the same.

59.    Further, interest and other income generated by the securities and assigned to customers on their statements was not determined or allocated on the basis of securities actually held in a particular SEG or even on the basis of what securities were reported on customer statements as belonging to that customer. Rather, the interest reported on customer statements was created by determining the total interest earned that day on Sentinel's entire portfolio, deducting from that figure the amount needed to pay interest on BONY's loan, interest to repo counterparties and Sentinel's management fees, and then artificially dividing the remainder up among customers based on the Insiders' subjective perception of what putative interest rate would satisfy particular customers.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 59 and, therefore, denies the same.

60.    As a result of the foregoing scheme, customer account statements reflected interest attributable to securities that were not allocated to the relevant customer SEG group, and interest reported on SEG 1 customer account statements in particular was in the aggregate overstated by millions of dollars.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 60 and, therefore, denies the same.

61.    In short, in every relevant way, Sentinel dealt with all securities it managed as part of an undifferentiated pool belonging to Sentinel itself. The cash deposited by customers was not used to buy securities, but to reduce the BONY loan. The customer statements, on which Defendant and certain other customers base their claims, were prepared for the sole purpose of creating for customers the false appearance that there were securities segregated for their benefit that equaled the total of their investments plus interest supposedly earned on those investments. Securities were not segregated, and the investment returns were false.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 61 and, therefore, denies the same.

## SUMMER OF 2007: SENTINEL'S COLLAPSE

62.    For the reasons explained above, at all times the securities supposedly owned by the customer SEGs were never their property. The events of the summer of 2007 clearly demonstrate that both Sentinel and BONY, the parties with the duty to segregate assets, did not treat these assets as belonging to customers at all, but rather as belonging to Sentinel.

**ANSWER:**  UBS denies the allegations set forth in paragraph 62.

63.    Many of the securities that Sentinel's insiders purchased during the 2004 - 2007 time period were acquired using repurchase agreements under which repo counterparties such as Fimat and Cantor Fitzgerald lent money to Sentinel to finance most of the acquisition costs of the securities, with the balance (the "haircut") financed by BONY. Many of the securities that were the subject of those repo agreements were illiquid, highly-structured investments and not the subject of material secondary market trading, and many (the physical securities) were not even registered in the DTC system.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 63 and, therefore, denies the same.

64.    The BONY loan used to finance the haircut on securities controlled under repo agreements increased dramatically over time, rising from $55 million at the end of 2003 to over $253 million at the beginning of May 2007. As indicated above, to secure the BONY loan Sentinel arbitrarily transferred into or left in the BONY Clearing/Collateral Account whatever securities were at hand and were necessary to make sure BONY was fully collateralized, without regard to segregation and without regard to who these assets supposedly belonged. As of early May 2007, more than $325 million in securities (par value) that were supposed to be segregated for the benefit of SEG 1 and SEG 3 customers actually were in the Clearing/Collateral Account or other unsegregated accounts supporting the BONY loan.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 64, and, therefore, denies the same.

65.    As of May 2007, Sentinel had incurred over $2.4 billion in obligations to repo counterparties in order to control securities with a value purportedly exceeding that amount. As the credit market tightened in the spring and summer of 2007, repo counterparties began to refuse to continue to finance lower-grade securities received from Sentinel under repo agreements, increasing their margin (haircut) requirements or simply refusing to continue to engage in repo transactions in such securities.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 65, and, therefore, denies the same.

66.     At the end of May 2007, Fimat became the first major Sentinel repo counterparty to refuse to continue financing certain securities. Fimat closed out the repo transactions related to certain high-risk securities, and returned more than $100 million (face value) in securities to Sentinel through the BONY clearing system. Pursuant to its repo agreements with Fimat, Sentinel was obliged to pay its repo obligation to Fimat or risk a default. Because Sentinel could not finance its repo payment to Fimat in any other way, on June 1, 2007, it borrowed an additional $94 million from BONY, increasing the BONY total loan balance to more than $353 million.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph 66 and, therefore, denies the same.

67.     To secure the increased loan, on June 1, Sentinel and BONY moved large blocks of government securities from both the SEG 1 and SEG 3 segregated government securities accounts, with a face value of almost $87 million, into the unsegregated Clearing/Collateral Account (the "June 1 Transfers"). These transfers took place at the end of the day and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. They also were made without regard to whether the securities returned by Fimat were "allocated" to SEG 1, SEG 3, the House, or no one at all (indeed, none of the securities returned by Fimat were reflected on customer statements as belonging to SEG 1 or SEG 3). After this transfer, less than $15 million (face value) of government securities remained in the SEG 1 segregated government securities account.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph 67 and, therefore, denies the same.

68.     On June 25, 2007, Fimat informed Sentinel that it would no longer finance an additional batch of securities through repo agreements, and returned another $140 million (face amount) in securities to Sentinel's physical account at BONY. As a result, Sentinel was again obligated to repay Fimat under its repo agreements with Fimat. In order to do so, it once again borrowed additional funds from BONY using assets that were supposed to be segregated as collateral.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph 68 and, therefore, denies the same.

69.     On June 26, 2007, Sentinel and BONY transferred virtually all of the remaining government securities in the SEG 1 and SEG 3 segregated government securities accounts, totaling in excess of $66 million in face value, into the Clearing/Collateral Account. Again, these securities were transferred without regard to whether the physical securities returned by Fimat — which caused the increase in the loan — had any relationship to SEGs 1 and 3.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 69 and, therefore, denies the same.

70.     After this transfer, there were no government securities in the SEG 1 government securities account, and only $15,000 face value of government securities in the SEG 3 government securities account. By this date, of some $463.6 million in face value of government securities held at BONY in connection with the Sentinel accounts, $463.1 million – more than 99% of all of Sentinel's government securities – were being held in the Clearing/Collateral Account for the benefit of BONY, not in segregated customer accounts.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 70 and, therefore, denies the same.

71.     At the close of business on June 29, 2007, Sentinel was still short $145 million in collateral. In order to fully collateralize the loan, Sentinel and BONY moved approximately $170 million in face value of corporate securities from the SEG 1 DTC account, representing one-half of the total value of that account, and transferred them into the DTC Clearing Account to be used as collateral for the BONY loan. Again, there was no connection between the loan increase and the source of the assets used to secure the loan.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 71 and, therefore, denies the same.

72.     On July 17, the loan increased to almost $497 million when another repo counterparty, Cantor Fitzgerald, closed out over $150 million (face amount) in repo positions with Sentinel. Sentinel and BONY again moved customer securities from the segregated SEG 1 DTC account into the DTC Clearing Account, this time more than $84 million in face value of DTC securities. There again was no connection between the securities returned and the same source of the assets used to secure the loan.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 72 and, therefore, denies the same.

73.     As of the open of business on July 30, at a time when Sentinel was reporting more than $655 million in customer balances attributable to SEG 1, only $84.6 million

17

in cash and securities (par value) remained in accounts denominated as segregated SEG 1 accounts. Thus, as of that date, less than 15% of all securities supposedly segregated and attributable to SEG 1 were actually held in segregated accounts, and instead more than 85% had been misappropriated and were being used to collateral to support the BONY loan. A large number of securities supposedly segregated and attributable to SEG 3 also were not being held in segregated accounts, and also were being used as collateral to support the BONY loan.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 73 and, therefore, denies the same.

74.     On about July 30, Sentinel's chief financial officer supposedly determined that assets attributable to SEG 1 customer accounts should not be used as collateral for the bank loan. Sentinel then began a program, with BONY's assistance, to move huge blocks of some (but not all) of the securities serving as BONY collateral into SEG 1 accounts. In order to ensure that BONY was fully collateralized on its loan, however, Sentinel and BONY undertook this program at the direct expense of Sentinel's SEG 3 customers and took from SEG 3 segregated accounts essentially all remaining putative SEG 3 customer assets that had not already been pledged for the BONY loan.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 74 and, therefore, denies the same.

75.     Specifically, on July 30, Sentinel and BONY moved $248 million (face value) in securities out of the DTC Clearing Account, where they had been used as collateral for the loan, and transferred them to the SEG 1 DTC account. On the following day, July 31, Sentinel and BONY moved $264 million (face value) in government securities, which had been sitting in the Clearing/Collateral Account, from that account to the SEG 1 government securities account.

**ANSWER:**  UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 75 and, therefore, denies the same.

76.     The transfer of over $500 million (face value) of securities to SEG 1 accounts over this two-day period would have created a gaping shortfall in BONY's collateral position. In order to plug that hole, on July 30 Sentinel and BONY took $289 million (face value) of securities from the segregated SEG 3 DTC account and moved them to the DTC Clearing Account, where they were posted to the Clearing Collateral account as security for Sentinel's loan. This action virtually emptied the SEG 3 DTC account, leaving only $900,000 (face value) of DTC registered securities in a segregated account which for months had consistently held more than $250 million (face value) worth of securities.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 76 and, therefore, denies the same.

77.     For the next two weeks, Sentinel's insiders juggled and in some cases delayed customer redemption demands. They allocated large numbers of securities to customer accounts that did not comply with customer investment specifications, and with respect to many of those securities could not and should not have allocated them at all because they already were serving as collateral for the BONY loan in unsegregated accounts. Nonetheless, during this time period the insiders continued to encourage customers to invest at Sentinel, and accepting hundreds of millions of dollars in customer deposits.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 77 and, therefore, denies the same.

78.     On August 13, 2007, Eric Bloom, President and Chief Executive Officer of the Debtor, sent a letter to Sentinel's customers representing that because of the pending liquidity crisis in the credit markets, Sentinel was halting redemptions out of a concern that it would not be able to meet significant redemption requests without resorting to discount sales that would cause unnecessary losses to its customers (the "Redemption Freeze").

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 78 and, therefore, denies the same and

refers to the August 13, 2007 letter for the terms thereof.

79.     Bloom did not disclose in his letter that Sentinel's liquidity problems actually had been created by his and other insiders' misuse of hundreds of millions of dollars deposited by customers, which they had used to engage in billions of dollars of undisclosed and unlawful leveraged securities transactions.

**ANSWER:** UBS denies having knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations set forth in paragraph 79, and, therefore, denies the same and

refers to the August 13, 2007 letter for the terms thereof.

80.     On August 17, 2007, Sentinel filed a voluntary petition under Chapter 11 of the Bankruptcy Code, and thereafter consented to the appointment of a chapter 11 trustee.

**ANSWER:** UBS admits the allegations set forth in paragraph 80.

## COUNT I

## (AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFER)

81.     The Trustee restates and realleges Paragraphs 1 through 80 as though fully set forth herein.

**ANSWER:**  UBS restates and incorporates its answers to paragraphs 1 - 80 above as though

fully set forth herein.

82.     Within two years prior to the Petition Date, the Debtor transferred property in which it had an interest to or for the benefit of Defendant with the intent to hinder, delay and defraud the Debtor's creditors and in furtherance of the fraudulent investment scheme detailed above. Specifically, when the Defendant closed its account with the Debtor on March 30, 2007, the Debtor transferred $108,387,950.97 to the Defendant, which consisted of $14,401,342.15 in false profits over and above the $93,986,608.82 principal amount invested with the Debtor as of January 1, 2005. The $14,401,342.15 payment was actually a false profit paid from the Debtor's consolidated capital pool. The Trustee now seeks to recover the $14,401,342.15 in false profits the Defendant received from the Debtor. (the "Avoidable Transfer").

**ANSWER:**  UBS denies the allegations set forth in paragraph 82, except admits that the Debtor

transferred $108,387,950.97 of UBS's customer's funds to UBS, on or about March 30, 2007,

when UBS closed its account with the Debtor.

83.     The Avoidable Transfer constituted a transfer of the Debtor's property.

**ANSWER:**  UBS denies the allegations set forth in paragraph 83.

84.     The Avoidable Transfer was made, mediately or immediately, to or for the benefit of the Defendant.

**ANSWER:**  UBS denies the allegations set forth in paragraph 84.

85.     The Avoidable Transfer may be avoided under § 548(a)(1)(a) of the Bankruptcy Code.

**ANSWER:**  UBS denies the allegations set forth in paragraph 85.

86.     Defendant may also have received additional fraudulent transfers which may be discovered during the discovery process.

**ANSWER:**  UBS denies the allegations set forth in paragraph 86.

87.     Pursuant to § 550(a) of the Bankruptcy Code, the amount of the Avoidable Transfer may be recovered from Defendant.

**ANSWER:**  UBS denies the allegations set forth in paragraph 87.

## COUNT II

### (AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFER)

88.     The Trustee restates and realleges Paragraphs 1 through 80 and 82 as though fully set forth herein.

**ANSWER:**  UBS restates and incorporates its answers to paragraphs 1-80 and 82 as though fully set forth herein.

89.     The Avoidable Transfer constituted a transfer of the Debtor's property.

**ANSWER:**  UBS denies the allegations set forth in paragraph 89.

90.     The Avoidable Transfer was made, mediately or immediately, to or for the benefit of the Defendant.

**ANSWER:**  UBS denies the allegations set forth in paragraph 90.

91.     The Debtor was insolvent on the date that the Avoidable Transfer was made or became insolvent as a result of the Avoidable Transfer.

**ANSWER:**  UBS denies the allegations set forth in paragraph 91.

92.     The Debtor was engaged in business or transactions, or were about to engage in business or transactions, for which the property remaining with the Debtor after the Avoidable Transfer constituted unreasonably small capital.

**ANSWER:**  UBS denies the allegations set forth in paragraph 92.

93.     At the time of the Avoidable Transfer, the Debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as the debts matured.

**ANSWER:**  UBS denies the allegations set forth in paragraph 93.

94.     The Defendant received less than a reasonably equivalent value in exchange for the Avoidable Transfer.

**ANSWER:**  UBS denies the allegations set forth in paragraph 94 and alleges that the Debtor

received reasonably equivalent value in exchange for the Transfer.

95.     Defendant may also have received additional fraudulent transfers which may be discovered during the discovery process.

**ANSWER:**  UBS denies the allegations set forth in paragraph 95.

96.     The Avoidable Transfer may be avoided under § 548(a)(1)(b) of the Bankruptcy Code.

**ANSWER:**  UBS denies the allegations set forth in paragraph 96.

97.     Pursuant to § 550(a) of the Bankruptcy Code, the amount of the Avoidable Transfer may be recovered from Defendant.

**ANSWER:**  UBS denies the allegations set forth in paragraph 97.

## COUNT III

## (DISALLOWANCE OF CLAIMS)

98.     The Trustee realleges and restates Paragraphs 1 through 97 as though fully set forth herein.

**ANSWER:**  UBS restates and incorporates its answers to paragraphs 1 through 97 as though

fully set forth herein.

99.     Pursuant to § 502(d) of the Bankruptcy Code, the Court shall disallow any claim of any entity from which property is recoverable under §§ 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under §§ 552(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under §§ 522(i), 542, 543, 550, or 553 of the Bankruptcy Code.

**ANSWER:**  UBS denies the allegations set forth in paragraph 99, except to the extent the

allegations set forth therein are consistent with the Bankruptcy Code sections cited above.

100.     Because the Defendant has not turned over to the Trustee the amount of the Avoidable Transfer, the Court must disallow under § 502(d) of the Bankruptcy Code any claims of the Defendant against the Debtor until the Defendant pays to the Trustee the value of such transfer.

**ANSWER:**  UBS denies the allegations set forth in paragraph 100.

### AFFIRMATIVE DEFENSES

Without admitting any of the allegations in the Amended Complaint, UBS asserts and alleges the following separate and independent defenses. By alleging the defenses below, UBS does not in any way agree or concede that the Trustee has properly stated any cause of action in the Amended Complaint or that UBS has the burden of proof or persuasion with respect to any of its defenses.

### FIRST AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because any and all transfers sought to be recovered are not avoidable pursuant to 11 U.S.C. § 546(e) including, but not limited to, because they are settlement payments and/or transfers made by or to, or for the benefit of, a commodity broker in connection with a securities contract.

### SECOND AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because the Debtor was solvent on the date of the Transfer.

### THIRD AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because the Debtor received "reasonably equivalent value" in consideration of the Transfer.

### FOURTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because any and all assets sought to be recovered by the Trustee from UBS do not constitute property of the estate under 11 U.S.C. § 541.

## FIFTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because any and all assets sought to be recovered by the Trustee from UBS were not commingled in such a way as to constitute property of the estate under 11 U.S.C. § 541.

## SIXTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because any and all assets sought to be recovered by the Trustee from UBS can be traced so as to confirm that such assets do not constitute property of the estate under 11 U.S.C. § 541.

## SEVENTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because the Debtor, pursuant to the written agreements between Debtor and UBS, has no interest in any and all amounts, assets and/or property that are the subject of the parties' dispute, and which the Trustee seeks to recover from UBS.

## EIGHTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail in that the Debtor has no interest in any and all amounts, assets and/or property that are the subject of the parties' dispute, and which the Trustee seeks to recover from UBS, because Debtor was merely a bailee or custodian.

## NINTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because any and all amounts, assets and/or property that are the subject of the parties' dispute, and which the Trustee seeks to recover from UBS, are subject to a statutory trust in UBS's favor.

24

## TENTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because any and all amounts, assets and/or property that are the subject of the parties' dispute, and which the Trustee seeks to recover, are subject to an express trust in UBS's favor.

## ELEVENTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because any and all amounts, assets and/or property that are the subject of the parties' dispute, and which the Trustee seeks to recover, are subject to a constructive trust in UBS's favor.

## TWELFTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because any and all assets sought to be recovered by the Trustee from UBS are subject to the earmarking doctrine.

## THIRTEENTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because UBS received the Transfer as a conduit for its customers.

## FOURTEENTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because UBS is not an initial transferee or an immediate or mediate transferee of an initial transferee for whose benefit such transfer was made pursuant to 11 U.S.C. § 550(a).

## FIFTEENTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because the Trustee is estopped from claiming any and all assets sought to be recovered from UBS as a result of Debtor's representations that the assets sought to be recovered do not constitute property of the estate.

## SIXTEENTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because UBS is a good faith transferee for value.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because the Complaint does not satisfy the

pleading requirements of Rule 8 of the Federal Rules of Civil Procedure as interpreted by the

Supreme Court in <u>Ashcroft v. Iqbal</u> and, in particular, pleads no facts from which the Court can

draw a reasonable inference that the Debtor was insolvent on the date of the Transfer to UBS.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The claims asserted by the Trustee fail because the Complaint does not comply with Rule

9(b) of the Federal Rules of Civil Procedure, nor has the Trustee pled sufficient facts to create a

presumption of actual fraud.

## RESERVATION OF RIGHTS TO ASSERT
## ADDITIONAL AFFIRMATIVE DEFENSES

UBS reserves all rights to assert any additional affirmative defenses as discovery

progresses. UBS further denies that the Trustee is entitled to relief, whether under statutory or

common law, under any of the claims or causes of action asserted by him in the Amended

Complaint.

## DEMAND FOR JURY TRIAL

Pursuant to its rights guaranteed by the Seventh Amendment of the United States

Constitution, UBS respectfully demands trial by jury.  UBS does not consent to a jury trial in the

Bankruptcy Court.

WHEREFORE, UBS Securities, LLC respectfully requests that this Court dismiss all claims against UBS Securities, LLC and enter judgment in favor of UBS Securities, LLC and against Plaintiff, Frederick J. Grede as Liquidation Trustee of the Liquidation Trust of Sentinel Management Group, Inc., plus fees and costs, and for such other relief as the Court deems just and equitable.

Dated:  August 21, 2009

**UBS SECURITIES, LLC**

By: /s/ Michael K. Desmond
One of Its Attorneys

*Local Counsel for UBS Securities, LLC*

Peter A. Silverman (#6196081)
Michael K. Desmond (#6208809)
Figliulo & Silverman, P.C.
10 S. LaSalle Street, Suite 3600
Chicago, IL 60603
(312) 251-4600

*Counsel for UBS Securities, LLC*

Alan E. Marder
Meyer, Suozzi, English & Klein, P.C.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York 11530-9194
Telephone:  (516) 741-6565
Facsimile:   (516) 741-6706

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney states that he caused a copy of the attached

**ANSWER, AFFIRMATIVE DEFENSES AND JURY DEMAND
OF DEFENDANT UBS SECURITIES, LLC**

To be served upon counsel listed below via Electronic Notification by the District Court's ECF Filing System on August 21, 2009.


/s/ Michael K. Desmond


COUNSEL:

Catherine L. Steege
Chris C. Gair
Vincent E. Lazar
Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL  60611